May it please the court. I'm Julie Fassbinder. I represent Robert Gary in his appeal of the grant of summary judgment by the district court in favor of the Facebook defendant, including Mr. Wayne Hawkins. Plaintiff's position here is that a reasonable jury could easily find that the decision in Q1 2014 to deny Mr. Gary a promotion to the IC-1, IC-2 position, including a pay raise that went along with a promotion, was based on his race. And, moreover, that any negative assessment of Mr. Gary was motivated by his race, by the statement of the decision maker, Mr. Wayne Hawkins, who stated that Mr. Gary was a lazy N-word, I will not use the word today, who wanted everything handed to him. After all, that statement is very close to the statement that the defendants have articulated as the reason for the denial of promotion, which is that Mr. Gary lacked initiative. In this case, the only issue on the prima facie case is the fourth element, that is, the first three elements are essentially conceded by the defendant. Mr. Gary is African American, he was not denied a promotion, which is an adverse action, and he was well qualified for the position. So the question is, have we established the fourth element of the prima facie case, which requires a plaintiff to demonstrate that he was not promoted under circumstances which give rise to an inference of unlawful discrimination. There are multiple pieces of evidence here which satisfy that fourth element. They include the fact that the manager, Mr. Facone, who was the manager over decision maker Wayne Hawkins, testified that Mr. Gary was initially on a promotion list for Q1 2014, and that he was taken off, allegedly, for his technical capabilities. The evidence of the fourth element is also satisfied by the fact that a white comparator, Mr. Randall, was not allowed to be promoted at Q1. Mr. Fosbinder, can I ask you a question about the statement you just made regarding the promotion list? My understanding was that the promotion list was initially fairly large, but then it was reduced as a result of feedback from corporate that the list was too large, and that really had nothing to do with Mr. Banks' relative merits or lack thereof. Am I right, or is that not correct? Well, that's partly correct, Your Honor. Mr. Facone's testimony was that Mr. Gary was on the list to be promoted in Q1 2014 to the IT2 level position, and that Menlo Park, that means Facebook headquarters, told them they had too many people on the list, so they reassessed people on the list, and that Mr. Gary, according to Mr. Facone's testimony, and he repeated this statement a couple times, was taken off based on assessments of technical capabilities. Now, with respect to that statement alone, that directly contradicts the articulated reasons that the defendants are using here to justify the non-promotion. That is, they're saying the reason is lack of initiative, and then later on they added communication. So that contradiction alone is sufficient to show not just the fourth element, but also is ample evidence of pretext. As the court knows, when the employer offers different justifications for the adverse action, that is strong evidence of pretext. Ms. Fosbinder, this is a different question here. Before you get into the details of whether or not you have shown pretext, I wonder if you would talk to us about whether or how the Supreme Court's recent decision in Comcast Corporation, which establishes a but-for causation standard in these 1981 cases, how that affects the application of the McDonnell-Douglas test to your case. Thank you, Your Honor. My understanding of the Comcast case is that for the 1981 claims, it does require a but-for causation. And but-for causation, according to many cases from this circuit and elsewhere, was the standard under McDonnell-Douglas. Essentially, it doesn't require you to show that the articulated reason is not in the picture. It just requires you to show that race or the other category is the but-for, that you wouldn't have been terminated or denied the promotion other than that. Now, I do not know, Your Honor, and I have not had a chance to research whether the Comcast decision would apply retroactively. That is, would it apply to our case, which was pending at the time? I'm just not sure of that question, Your Honor. But if I understand your answer, you say it really doesn't affect the analysis here, that you think you can meet that but-for causation standard in this case. Yes, Your Honor. I think we can meet it easily. I think we have a case where the primary decision-maker was a racist, and he repeatedly said to people at the facility, yes, Your Honor. Does it matter to your argument that we don't know when he made the racist statements about your client as well as all the other racist statements he made? That is, does it matter that we don't know whether or not it was in proximity to the adverse employment decision? I don't think it does. I think it certainly matters in the sense that I can't tell you under Fourth Circuit precedent that it's direct evidence. That is, it was not said exactly at the time that he was denied the promotion. We don't have that proof. But what we do have proof is that we have multiple people that testified that he made these racist remarks, and we have identified them in the record. They include Mr. Gill, who said that he used the N-word repeatedly. He described Mr. Gary that way, and he described Mr. Duffy that way. Mr. Gill's statement also says that he made the statement about Mr. Duffy as being an N-word within a month of Mr. Duffy's hire, approximately. And Mr. Duffy's hire was approximately the same time that Mr. Gary was denied this promotion, that is, in early 2014. We also have the statement of Mr. Hawkins, who was the only other African American in the initial phase of this case, working there repeatedly as a monkey. Multiple people heard that. Mr. Gary heard that himself, and he reported that to Facebook Human Resources in 2014, and no action was taken. And I know I've got a little far field from your question, but Mr. Blalock – I'm sorry, let me get back to my notes. I believe it was Mr. Blalock who said that the statement that he heard was made between 2011 and 2014. Mr. Hawkins was already fired by mid-2015, so we know these statements were not made very far away in time from the decision that's at issue here. And more importantly than that, to my way of thinking, this is a 52-year-old man, Mr. Hawkins is. At the time that these decisions were made, or at least at the time that he signed a declaration, he didn't become a racist overnight. He came into the workplace with that mindset. And he said of Mr. Gary, he's a lazy ant who wants everything handed to him. And Mr. Hawkins' statement to that effect shows that he was really against Mr. Gary moving forward. That's, I think, very strong evidence of that. And it's coupled with the fact that after Mr. Gary got the promotion to the night shift engineer position, Mr. Hawkins told another manager that he shouldn't be complaining about not getting a pay raise. That is, Mr. Gary was told this is a promotion to the night shift engineer position. He was doing the work of a night shift engineer, which according to Mr. Hawkins was an IC2 level position. We have that in the record. And so given the fact that it was an IC2 level position, Mr. Gary's question about getting a pay raise was very reasonable. And for Mr. Hawkins... As I understand this case, there's also another decision maker here, Mr. Hamrick, who supervised your client as well. And I suppose the key question here is, who was the key driver of the decision making process? Was it Mr. Hawkins or was it Mr. Hamrick? As I understand the other side's argument, they say that Mr. Hamrick, and there's no indication in the record that Mr. Hamrick had these racist tendencies, as did Mr. Hawkins, also had negative things to say about your client with respect to his initiative and his doing poorly on a project that he had assigned to him. And they point to that as objective evidence to show that this was not a pretext, but was in fact that these facts support the decision not to promote him and to promote someone else. So can you speak to that? Yes. I think you've got three questions in there, Your Honor, if I may address them. I don't know how many, but you can take them in whatever order you want to. If I may address them in order. First of all, the evidence shows that Mr. Hamrick did not agree with the decision to not promote Mr. Gary. That is, we cite his deposition testimony at Joint Appendix 1108, where I asked him, did you agree with Mr. Hawkins' assessment that Mr. Gary meets all expectations for Q1 2014? We had a discussion about it. I asked why we couldn't move forward with the promotion, and I was told there wasn't enough impact to warrant a promotion. Mr. Hamrick admits, in terms of his statements about Mr. Gary's performance being negative, there were no negative statements from Mr. Hamrick about Mr. Gary's performance that preceded or were contemporaneous with the decision to deny him the promotion. That is, he said at JA 1107, 1108, and 1316 that the only input he had into the promotion decision, into the Q1 2014 evaluation, was his peer summary form. The peer summary form appears in the record, and it provides only positive remarks about Mr. Gary, referring to him as a great watchman, saved our team and company great expense and anguish, and said Mr. Gary should be tasked with more project work because he wants to make a difference and make the job easier for his fellow employees. Mr. Hamrick, I repeatedly talked to him about the time frames in this matter, and the citations are in the brief, 1076 to 1077, and multiple times he said Q1 2014 was the quarter where Wayne Hawkins would have been the manager doing that. Then he said, even in response to his attorney's questions, that it was the evaluation's opinion, that is Mr. Hawkins' opinion, the discriminator, that Mr. Gary lacked initiative or lacked communication. He said again, I was not the person that performed this evaluation. Finally, I asked him about his perceptions of Mr. Gary's performance, because after Gary worked night shift, and Mr. Hamrick had just come into the supervisory role, and Mr. Hamrick said his perception came directly from Hawkins. That's a JA 1113. So again, he didn't do the evaluation, he didn't sign the evaluation, he refused to claim ownership of Mr. Hawkins' assessment of Gary's weaknesses, even when pressed by his own attorney. Now, later on in his deposition, he does say that he agrees with this assessment, but he said the assessment came from his boss, who by the way, had just put him into this managerial position, and that is also in the record. So the only document in the file at the time from Matt Hamrick was the peer summary form. Again, we cite to that at 1107, 1108, and 1316. And then what happened is Mr. Hawkins added to that peer summary form a negative comment on the evaluation. He copied the peer summary form and added the negative comment, which said that Robert works at an IC1 level, and basically in the future he will be tasked with greater projects, and in order to achieve the next level he needs to be more of a self-starter. So Mr. Hamrick is not the person that drove the decision here, or made the decision here, he was part of a committee that met, and Mr. Hawkins drove the decision here. In addition, there's numerous inconsistencies, as I said, about the actual reason for the denial of promotion. We have one manager, Mr. Foucault, clearly stating in his deposition testimony that it was the technical capabilities, that's at JA 1205, 1208, that caused Mr. Garrett to be removed from the position. Then we have the other two managers saying, and again it's with Mr. Hamrick after the fact, that it was communication and initiative. And those are very weak reasons, and for weak subjective reasons such as that, the courts are clear that it's easier to make a showing of pretext. In addition, pretext can be shown here by the fact that Mr. Hamrick didn't agree with the decision, by the fact that Mr. Gary was told he was already promoted, and that he'd get a pay raise after he'd been in the position for six months, which was the Q1 2014 evaluation, by the fact that there's ample evidence in the record that Mr. Gary actually had great initiative and good communication skills. And pretext is also shown by the fact that Mr. Randall's communication skills were sorely lacking, and in fact, Mr. Hamrick at 69 and 70 of his deposition concedes that he had to teach Mr. Randall how to write an email. So we've got multiple pieces of evidence that would allow us to determine that there's pretext. In addition, the company violated its own policies here. They had a job description for critical facilities technicians, which is at 337 and 338. It's got a minimum qualification list and requires people hired into this position, which was a very technical position, to have two years' experience in a data center or other critical environment and three years' journeyman experience. And Mr. Gary met and exceeded those qualifications easily. He had worked in the field in HVAC for over seven years as an installer and service technician. He had community college diplomas and certificates in these subjects. Mr. Randall, in contrast, did not meet any of these job qualifications and had been employed as a janitor just before he got onto the job. And in fact, he had no experience in any sort of mechanical, technical, or electrical work. And Hamrick asked Mr. Gary to train Randall, and Gary showed him the ropes and duties of the job. That's at JA1117. So Mr. Hamrick's Q3 2014 performance review of Mr. Gary says, Robert has transitioned Greg Randall in his – I'm sorry – has mentored Greg Randall in his transition to night shift. So Mr. Gary's testimony throughout his deposition and declaration is that Mr. Randall did not know how much of the equipment work, could not perform troubleshooting techniques, and could not send an email that described incidents on the job. We also brought up another comparator, Mr. Walker, in terms of showing that Facebook did not follow these articulated reasons in giving jobs to people if they were white or in promoting them if they were white. And of course, employers' deviations from their written policies or established practices are good evidence of pretext. In addition, when Mr. Gary – Ms. Fosbinder, Ms. Fosbinder, have you decided that you're going to erode your rebuttal time? Because the red light has been on. Oh, I'm sorry, Your Honor. I didn't see the red light. I apologize. Do you want to go forward? You reserved six minutes, but if you want to, you can, but you have four minutes plus – No, I'll stop now, and I'll keep my rebuttal time. Thank you, Your Honor. Oh, thank you. All right. Mr. Johnson? May it please the Court, I represent Facebook, and I speak also on behalf of the defendant, Wayne Hawkins, whom I do not represent. This Court should affirm the trial court's grant of summary judgment in this case because the trial court properly found, one, that the plaintiff failed to establish a prima facie case, and two, that the plaintiff failed to overcome Facebook's legitimate nondiscriminatory reasons for granting a promotion to one individual and denying the promotion at the same time to the plaintiff. It's important to point out that this case involves a single promotion decision made in the first quarter of 2014. At that time, the evidence shows – I'm sorry to interrupt. It's a single promotion or lack of promotion decision made by a racist, so how can that alone not be prima facie evidence of racial bias sufficient at this stage to get past summary judgment? That, Your Honor, would ignore the multiple pieces of evidence in the case, undisputed evidence that the decision was made not by an individual, but rather by Facebook and a group of individuals, that the individuals responsible for that decision, with the exception of Mr. Hawkins, have exhibited no evidence whatsoever of racial bias, and that the decision was fully warranted based on undisputed facts. But the record seems to demonstrate that Mr. Hawkins was – okay, yes, technically the decision was made by a committee, but the record seems to demonstrate that Mr. Hawkins did the evaluations. Mr. Hawkins acted as his supervisor, and Mr. Hawkins drove the committee decision. In fact, Mr. Hamrick inquired why they couldn't move forward with a promotion, and when Mr. Hawkins gave the response there wasn't enough impact or something to warrant a promotion, which is sort of vague, Mr. Hawkins just said he didn't have any reason to disagree. He didn't have any reason to disagree because Mr. Hawkins was the one conducting the supervision and evaluation. So, how can you say – I just don't see how a committee made this decision. I see that there was a committee, but the facts appear to indicate that the racist made this decision. And, you know, there's enough here for a jury – not a jury, well, yes, a jury – to go forward and consider this. At summary judgment stage, what's your response to – I don't even know if that's a question. It's a challenge, I guess, to your assertion that this decision was made by a committee. I guess, show me where anybody else in this committee made the decisions. It well deserves a response, Your Honor, and if you look at the testimony in deposition given by Mr. Hamrick and the record as a whole, as the district court did, the evidence is clear that Mr. Hamrick was the supervisor of the plaintiff beginning in July of 2013, that he continued to supervise both the plaintiff and Mr. Randall, the comparator. Who did the evaluations for them? The written evaluation was prepared by Mr. Hawkins, but the discussion and the determination with respect to who of the two would receive a promotion was made by a group in which Mr. Hamrick had considerable input. So – oh, wait, I'm sorry, you were about to say Mr. Hamrick had considerable input. I'd like to hear his considerable input. All right. Well, according to Mr. Hamrick, who supervised them both, he's testified in deposition and made clear in his – in providing other information to Facebook throughout the course of this case that he believed Mr. Randall demonstrated initiative that was superior and significant hands-on experience that was superior to what was exhibited by the plaintiff. And what's the jury's side for that, counsel? Beg your pardon? What's the J.A.'s side for what you just said? The J.A.'s side, Your Honor. Where he said that they're significant. Yeah. Do you have it? You don't have it? Yes, sir. I mean, I don't want you to go through it and fumble through it. I thought maybe you had it earmarked or something. Yeah. As counsel did when she was – when Fassbein was responding to the J.A. Yes, sir. Your Honor, I will have that for you. You should be prepared on that because that's the – isn't that the heart of your case? You're saying that Mr. Hembrick was the driving force and you don't have a specific site in the J.A. for that? Go ahead. Go ahead. Yes, Your Honor. But I'm surprised that you wouldn't have that. During the six months prior to the Q1 evaluation and the promotion decisions, Mr. Hembrick testified that Mr. Randall, quote, worked with vendors, was very busy around the facility, and was handling multiple situations. Furthermore, Mr. Randall – Mr. Hembrick testified that Mr. Randall's, quote, strength was verbal communication, holding vendors accountable, making sure things were passed on, and making sure the facility – Was Mr. Randall the one that couldn't write an email? There is testimony that Mr. Randall had some difficulty writing emails. There is also testimony in the record from Mr. Hembrick that the issue regarding – that Mr. Randall had superior verbal communication and that he dealt in a superior fashion with vendors who came to the facility. Is it true that Mr. – Gary had to train Mr. Randall? At the time Mr. Randall began work, it's true that Mr. Gary gave some training to Mr. Randall in the operation of the facility. That's true. And got him up and running, didn't he? That is not one of the factors that was considered at the time of promotion. By that time, Mr. Randall was well – It brings into question the quality of your evaluation, though, doesn't it? The case law, Your Honor, is clear that an employer may base promotion decisions on factors selected by the employer. And the relative experience of the parties, while that could have been a factor, was not a factor in assessing the relative merits between Mr. Randall and the plaintiff. Mr. Johnson, you can't deny, can you, in this record, that Mr. Hawkins had significant impact in that decision. Can you deny that? That is – Your Honor, that is true. Mr. Hawkins had impact, no doubt, in that decision. Significant, significant impact. Yes, sir. That is correct. And you can't deny that he made direct comments that are racial animus of an ugly kind in nature. Is that correct? In the record, there is a single piece of evidence, an affidavit submitted by Brian Gill, that attributes an utterly reprehensible racial comment to Mr. Hawkins. Comments. Comments. Plural. Not just one. Comments. Plural. Repeated. Your Honor, I do not believe the record supports that notion of repeated comments. If you look at Mr. Gill's affidavit, which I do have – Okay. Maybe we just better back up and – Yeah. Does Facebook deny that Mr. Hawkins was a racist? Was a racist at the time? No, Facebook does not deny that. Okay. But Facebook does not only deny, and the record makes clear that the assertions of the plaintiff in his brief about ongoing comments, about ongoing and constant comments, are not correct. There is no evidence of that. What the record contains is a single affidavit from Brian Gill, and this is JA 421, in which he references a statement by Wayne Hawkins, and he couches that as an or statement. That he was a lazy, and then a reprehensible term, or a lazy, reprehensible term, always wanting something. That is the sole statement in the record. Okay. That's the sole statement with regard to Mr. Gary. My point was, Mr. Hawkins made multiple statements about others, including Mr. Duffy. Why was he fired? Mr. Hawkins was fired for making inappropriate statements on the basis of race, sex – Statements, plural. Okay. And Mr. Gill's criminal record. That's correct. And he was fired in August of 2015, after these incidents came to light. Why does it matter that it was – why does it matter when the statements were made, if Facebook acknowledges, as it does, that Mr. Hawkins was a racist and made this decision? Well, you don't acknowledge he made this decision, but you do acknowledge he was a racist. So why does it matter when he made all these statements? Because there's no evidence that his statement was made at or around the time of the decision with respect to promotion, or that his statement in any way was related to or affected that promotion decision. Does Facebook question whether or not he was a racist – Mr. Hawkins was a racist at or about the time the decision was made? There is no evidence that Mr. Hawkins made any race-based decisions at or around the time – made any race-based statements at or around the time the decision was made. And no evidence that race of the respective candidates affected the decision by Facebook with respect to the promotion. No evidence that race discrimination played any role in the decision to promote Mr. Randall. And no evidence that race played any role in the decision to delay the plaintiff's promotion for six months. Now the plaintiff was promoted to IC2 in August – What would that evidence look like? What evidence do you submit is required to show that race played a role in this decision? Did he actually say it in the meeting? Did he actually say to the committee members, I'm not promoting Mr. Gary because blah, and then some racist statement? That would certainly be such evidence, Your Honor. I don't think it has to rise to that level. But there has to be some nexus in both time and the actual decision that would support such a conclusion to allow this case to proceed to a jury. I would note that that's a principle this court has followed in multiple decisions, including a case that came down on Monday of this week, Cole v. Family Dollar Stores of Maryland. In that case, an individual supervisor made numerous ageist statements and didn't just make the statements in general, made them to the plaintiff, including that you're too old for this job, I think you're too old to do your work, I want to replace older people with younger people. There was absolute evidence of ageist animus in that case. And the court affirmed, nevertheless, summary judgment for the employer, where the employer articulated a legitimate non-discriminatory reason for its decision to terminate, in that case, the plaintiff. Is that the plaintiff that wasn't showing up for work at all? That's a plaintiff who was ultimately terminated for missing work. That's correct, Your Honor. Yeah, I'm familiar with that case. And the rationale in that case is absolutely supportable or is viable in this case. The court noted there has to be. Counsel, you just cited a case where there was uncontroverted problems with absenteeism against that, those direct words of age discrimination words. In this case, do you have that? Mr. Garrett, who was on the precipice of being promoted before, is only until someone said Menlo, someone suggested in the record that, say we had too many people and that he didn't make the cut because they went all the way down. You don't have, that's not the type of case. Here's a person who worked on the night shift basically alone. And so the facts are different. You cite that case, recent case from our court, as if that's the end of all being in that regard. This is quite a different thing. You don't have that side. Do you? Do you have, Mr. Garrett, violated it and didn't come to work and was incompetent? No, there's certainly no evidence that the plaintiff was incompetent. But there is evidence, uncontroverted evidence, that the work performance of Mr. Randall was superior to the work performance of the plaintiff. Was Mr. Randall, did Mr. Randall work at night? He did during part of that time and he also worked during the day. So he had experience at both times. And during the day you can interact with vendors, but at night you can't, correct? That is true. So how is that to be held against Mr. Gary? It's not held against him. You mentioned earlier as one of the reasons for the difference in treatment that Mr. Randall interacted with vendors and got out and about. That's not to be held against Mr. Gary, but it is to be held in favor of Mr. Randall. Mr. Randall made the most of his opportunities and achieved good results and was credited for that. That's not a slam on Mr. Gary, but if you're looking at two candidates to be considered for promotion and one candidate has those advantages, has that performance, and the company values those factors, there's certainly no suggestion that race is involved in making the determination that Mr. Randall, by virtue of his performance on the day shift and his performance with vendors, should be penalized for that. How long had Mr. Randall been there before? Who was there first, Randall or Gary? The plaintiff, Mr. Gary, was there first. That's what I thought. So Mr. Randall was allowed to be on day shift, although he was less senior. And Mr. Gary was also allowed to be on day shift, and he agreed to a transfer to the night shift in large part, we believe, because there was a pay differential and he was paid more when he was on the night shift. There's no suggestion that day shift versus night shift evinces any form of discrimination at all. That was a choice Mr. Gary made to serve on the night shift. So going on the night shift meant that you pretty much going up against anybody, you don't get promoted against someone who's on day shift because you can't interact and communicate. It doesn't mean that in any general sense. In this particular case, it may have allowed Mr. Randall an opportunity to engage in activities that enabled him to advance, that allowed him to develop additional skills and capabilities. I note, however, that Mr. Hamrick notes in his testimony, and I do have a J.A. cite for this, that when Mr. Gary, the plaintiff, was given an opportunity by Mr. Hamrick to branch out, to do additional tasks, to take on a special project of creating a numbering system, the plaintiff struggled to stay on task, failed to provide information when Mr. Hamrick requested it, and he didn't stay motivated. Mr. Hamrick testified that the plaintiff never finished the task, and that's J.A. 1107. So when he was given an opportunity to succeed at a task that was outside his rudimentary activity of simply walking around the facility to make sure the lights were on, the plaintiff did not complete that task. Now, he wasn't penalized for that, but he also wasn't promoted for that. And that is a legitimate non-discriminatory reason. Mr. Johnson, did that special project that you just mentioned, was that during the same quarter in which Mr. Hamrick gave what was essentially a glowing evaluation to Mr. Gary, or was that during a different time period? It was in the same quarter in which Mr. Hamrick had favorable things to say about the plaintiff. That's true. But Mr. Hamrick also had this to say about the plaintiff. Right, but he didn't say it in the evaluation that was contemporaneously filed. He said in part in response to a claim that Mr. Gary was being treated unfairly because of his race. So that has some concern for me. But let me ask you this. Let's assume that we agree that perhaps Mr. Randall was a marginally better employee than Mr. Gary. Does that necessarily eliminate the basis for the claim that because Mr. Hawkins was the driver, if we agree that he was the driver of the promotion decision, that that was nonetheless, that his failure to promote Mr. Gary was in fact driven by his racist beliefs, and not because of his qualities as an employee? In other words, are the two mutually exclusive, or can the plaintiff prevail on either one of those? Your Honor, I submit that they are mutually exclusive. If indeed Mr. Randall was a better performer, and the evidence all points to that, then the plaintiff has failed to establish the fourth element of a prima facie case in a failure to promote action. That is, when you've got comparators, and the plaintiff cannot show he was better than the person who actually received the promotion, then the plaintiff has failed to establish his prima facie case. Likewise, the plaintiff has failed to show that the reason given by the employer was pretextual, where indeed the employer chose the more qualified individual for the promotion. That's consistent with many decisions of this court, and it's consistent with the question you posed earlier, as a but-for basis for determining whether discrimination occurred. I see that my time is up, and I thank members of the panel, and ask that the court vote to affirm the District Court's decision granting summary judgment in this case. Thank you. Thank you, Mr. Johnson. Ms. Folsom-Binder, you have some time. Thank you, Your Honor. I'd like to address first the last discussion about the special project that Mr. Gary was tasked with. Mr. Johnson cites to page 1107 of the joint appendix, all that Mr. Hamrick testified to there was that the project was not completed. He said, did he offer up any reason as to why he did not complete the project? And he says, no. This testimony that they bootstrapped to that, saying that Mr. Hamrick said that Mr. Gary struggled to stay on task, etc., etc., that's all contained in Ms. Marcieri's affidavit. She's a human resources person who wasn't there at the time of these events, and who went in and interviewed after the fact, and that's hearsay. That's not relevant evidence. It's not part of the record. It's part of the record, but it shouldn't be considered part of the record. And in fact, with respect to this special project, Mr. Hamrick talks about it in his performance evaluation as a good thing, first of all. And secondly, with respect to the special project, Mr. Hawkins testified in his deposition that it was something good that Mr. Gary had done. I don't have a cite for that, but I can find a cite for that. That is, the special project is a red herring. And that's just something that was in human resources documents, long after the fact when they were investigating Mr. Gary's complaint that he was denied a promotion because of race discrimination. That is the story that they came up with. A couple other things I wanted to address with respect to Mr. Johnson's argument. This committee that the decision was run through consisted of, according to Mr. Hawkins, three people. Him, Mr. Gordon, and then either Hamrick or Quarles, he couldn't remember. He testified, and this is at JA 1152 and 1153 to 1155. Mr. Hawkins testified that Mr. Gordon had no real input because he was the chief building engineer for a different building, and that's at 1155. So what we really have here is two people that were in the committee, and I think I've already addressed the fact that we think there's ample evidence that the jury can conclude that the key decision maker here, the man driving the decision to deny Mr. Gary a promotion, was indeed the racist person, Mr. Hawkins. And I think the court understands, or well, let me just put it a different way. There is ample evidence in the record that it wasn't just one comment that Mr. Hawkins made that was horrible terminology about African Americans, but it was multiple comments. We do have a couple pieces of evidence that show it was, we don't have, it was shown contemporaneous to the promotion decision, but close to the promotion decision. As I said, Mr. Gill's affidavit, I believe it's 421 to 422 of the JA, says it was about a month after Mr. Duffy's hire that Hawkins referred to Mr. Duffy as an N person. And by the way, Mr. Duffy was a plaintiff in this case initially, whose matter was settled, but he was a manager, so to refer to him that way, well, anyhow, and then Mr. Ms. Fossbinder, can I ask you the same question I asked Mr. Johnson? I know you disagree with this, but if we were to find that Mr. Randall was indeed, objectively speaking, based on this record, a better qualified employee, does it matter what Mr. Hawkins was saying or doing at the time? Does it matter about his racist, obviously blatantly racist, tendencies, or is that the end of the case? Oh, no, that's not the end of the case. And the reason I submit that is, there was no, there's no objective evidence in the record that Mr. Gary could not have been promoted at the same time. It wasn't two people vying for a promotion decision. So, in your scenario, if there were two people vying for a promotion decision, absolutely, it would be a problem for the plaintiff if you could show objectively, first of all, and I don't think we have that, objectively, that Mr. Gary was less qualified, but we don't have that here. We have a situation where, just, if you look at the record, I believe it's Exhibit 28, and I don't have the JA site, but virtually, and I believe everyone in the facility, as you know, was white at this time, except Mr. Quarles and Mr. Gary. They were all promoted to CF, they were all promoted to IC2 and IC3 within the 2013 and 2014 timeframe. Mr. Gary was the one left behind. So, even if Mr. Randall was better qualified, which we submitted completely was not, the question is, was the decision to deny the promotion to Mr. Gary motivated by race? And I think the answer on this record is, a jury could readily conclude that it was. Does that answer your question, Your Honor? Thank you. So, there's also evidence in this record that, as I said, the company had articulated qualifications for hiring, and it is a technical position, and Mr. Randall and Mr. Walker did not meet those qualifications. And in addition to that, there's a document in the file which describes the qualifications for the CFT position and CFE positions, and it shows that Mr. Gary met and exceeded those qualifications. I see that my time is almost up, so I would just ask this court to please respectfully request that we, that you reverse the decision of the district court. Acknowledge that a reasonable jury could find here that the denial of promotion decision was indeed affected by Mr. Gary's race and remand the matter. Thank you. Thank you very much. Counsel, we're sorry we can't come down and greet you as we would do in Richmond, but know, nonetheless, that we very much appreciate your argument, and thank you, and wish you well, and be safe, and stay well. Thank you so much. Thank you, Your Honor.
judges: Roger L. Gregory, Albert Diaz, Stephanie D. Thacker